**AMERICAN BANANA CO., INC., Finest Fruits, Inc., Bronco Produce Corp., Jacobson Produce Corp., Morris Okun, Inc., D.M. Rothman, Inc., Rubin Bros. Produce Corp., Rosenthal & Klein, Inc., Square Produce, Inc.,**

**34**

Post & Taback, Inc., A.J. Trucco Corp., and Wishnatzki & Nathel, Inc., Plaintiffs–Appellants–Cross–Appellees,

L & P Fruit Corp., H. Schnell & Co., Inc., and Martin Striks & Sons, Inc., Plaintiffs,

v.

REPUBLIC NATIONAL BANK OF NEW YORK, N.A., Defendant–Third–Party–Plaintiff–Appellee–Cross–Appellant,

Gail Werner, Jack Turano, PMD Produce Brokerage Corp., and Mark Werner, Third–Party–Defendants.

Docket Nos. 02–9442(L), 02–9504(XAP).

United States Court of Appeals, Second Circuit.

Argued: Sept. 10, 2003.

Decided: March 11, 2004.

Leonard Kreinces (Howard S. Rosenberg, on the brief), Kreinces & Rosenberg, P.C., Westbury, NY, for Plaintiffs–Appellants–Cross–Appellees.

John P. Amato, Hahn & Hessen LLP, New York, NY, for Defendant–Third–Party Plaintiff–Appellee–Cross–Appellant.

Before: VAN GRAAFEILAND, CABRANES, and B.D. PARKER, JR., Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

From 1995 to 1996, Plaintiffs–Appellants ("Sellers")[1] sold fruit and other fresh produce to Third–Party Defendant PMD Brokerage Corp. ("PMD"), which maintained a checking account at Defendant Republic National Bank of New York (predecessor of HSBC Bank, USA, and for our purposes, "HSBC"). Such sales are regulated by the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a–499t. At issue in this appeal is a provision of PACA that requires produce dealers, such as PMD, to hold all perishable agricultural commodities they have purchased on short-term credit, as well as any proceeds from sales of those commodities, in trust for the benefit of the unpaid sellers of the produce until full payment has been made. 7 U.S.C. § 499e(c)(2).

After PMD defaulted on amounts it owed, and the Sellers failed in their efforts to obtain repayment from PMD, the Sellers sued HSBC. They claimed that HSBC's retention of deposits made by PMD to offset PMD's overdraft balance constituted a breach of the PACA trust. After a bench trial, the District Court concluded that HSBC had breached the PACA trust by accepting PMD's deposits of PACA funds, to the extent that such funds were then paid to creditors who were not beneficiaries of the PACA trust. The Court then awarded the Sellers $278,967 in damages and interest. On appeal, both parties challenge the scope of liability. For the reasons that follow, we reverse the judgment of the District Court and remand with instructions to enter judgment for HSBC.

## BACKGROUND

### I. PACA

Congress enacted PACA in 1930 to regulate the sale and marketing of produce in interstate commerce. *See* H.R. REP. NO. 98–543, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406; *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1066 (2d Cir.1995). Through PACA, Congress sought "to encourage fair trading practices in the marketing of perishable commodities by suppressing unfair and fraudulent business practices in marketing of fresh and frozen fruits and vegetables ... and providing for collecting damages from any buyer or seller who fails to live up to his contractual obligations." H.R. REP. NO. 98–543, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406.

Among other things, PACA requires licensing of all entities qualifying as commission merchants, dealers, and brokers ("buyers"), *see* 7 U.S.C. § 499c; bars a variety of unfair trade practices by buyers, *see id.* § 499b; and provides various remedies when violations occur, *see id.* § 499e. PACA requires buyers to make "full payment promptly" for all commodities received from produce sellers. *Id.* § 499b(4). If a buyer fails to make a prompt payment, a seller may seek to recover resulting damages by either (1) filing a complaint with the Secretary of the U.S. Department of Agriculture ("USDA"), or (2) filing a lawsuit "in any court of competent jurisdiction." *Id.* § 499e(a), (b).[2]

---

1. The plaintiffs who have appealed are American Banana Co., Inc., Finest Fruits, Inc., Bronco Produce Corp., Jacobson Produce Corp., Morris Okun, Inc., D.M. Rothman, Inc., Rubin Bros. Produce Corp., Rosenthal & Klein, Inc., Square Produce, Inc., Post & Taback, Inc., A.J. Trucco Corp., and Wishnatzki & Nathel, Inc.

2. If the seller chooses the former route, it must first file an informal complaint with the

In the early 1980s, Congress reexamined PACA in the wake of a sharp increase in defaults among buyers. Although it found that PACA generally worked well in making the marketing of perishable agricultural commodities more orderly and efficient, Congress determined that sellers needed greater protection. *See* H.R. REP. NO. 98–543, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406. Congress noted that, as a result of the exigencies of the perishable commodities business, sellers were typically required to sell their produce quickly and frequently found themselves in the position of unsecured creditors of buyers whose creditworthiness could not be verified. If buyers defaulted, sellers could look only to the commodities (which would have perished) or to the sales proceeds of the commodities. Since sellers were typically unsecured creditors, they generally stood in line behind banks and other lenders who had obtained security interests in the defaulting purchaser's inventories, proceeds, and receivables. As a result, sellers were often unable to collect monies owed to them. *See* 7 U.S.C. § 499e(c)(1); H.R. REP. No. 98–543, at 3–4 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406–07; *Endico Potatoes*, 67 F.3d at 1067; *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 77 (2d Cir.1990). Congress viewed this instability as a burden on commerce and contrary to the public interest. *See* 7 U.S.C. § 499e(c)(1); H.R. REP. NO. 98–543, at 4–5 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 408.

As a remedy, Congress amended PACA in 1984 to make the sellers' interests in the commodities and sales proceeds superior to those of the buyers' creditors, including secured creditors. It did so by adding section 499e(c), which requires licensed dealers to hold all perishable commodities purchased on short-term credit, as well as sales proceeds, in trust for the benefit of unpaid sellers:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

USDA within nine months after the claim accrues. *See* 7 C.F.R. § 47.3(a). Once it receives the informal complaint, the USDA will investigate the matter, and if it finds no violation, it will take no further action. *See id.* § 47.3(b)(1). If the allegations and investigation "seem to warrant [further] action," however, the USDA will attempt to mediate an amicable settlement. *Id.* § 47.3(b)(2); *see also* U.S. Department of Agriculture, Agricultural Marketing Service, Fruit and Vegetable Programs, *PACA Fact Finder* at 2, *available at* http://www.ams.usda.gov/fvpaca/Fact-Finder.pdf (last visited Feb. 24, 2004). If this procedure fails to effect a settlement, the seller may file a formal complaint with the USDA within 90 days of notification of the opportunity to proceed formally. *See* 7 C.F.R. § 47.6(a). If, in adjudicating the formal complaint, the USDA determines that the buyer has failed to pay promptly, the USDA must determine the amount of damages and issue a reparation order directing the buyer to pay that amount to the seller. *See* 7 U.S.C. §§ 499f, 499g. In addition, the USDA "may publish the facts and circumstances of such violation and/or, by order, suspend the license of such offender for a period not to exceed ninety days, except that, if the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender." *Id.* § 499h(a). Instead of suspending or revoking the seller's license, the USDA "may assess a civil penalty not to exceed $2,000 for each violative transaction or each day the violation continues." *Id.* § 499h(e).

7 U.S.C. § 499e(c)(2). This provision impresses a "non-segregated 'floating' trust" on the commodities and their derivatives, in the sense that it permits buyers—i.e., trustees—to commingle PACA trust assets with their other assets. 7 C.F.R. § 46.46(b); *accord Endico Potatoes*, 67 F.3d at 1067; *JSG Trading*, 917 F.2d at 78; H.R. REP. NO. 98–543, at 2, 4, 5, 10, 11, 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406, 407, 409, 414, 415. To enforce payment from the trust, PACA beneficiaries may sue in an appropriate U.S. district court. 7 U.S.C. § 499e(c)(5)(i).[3]

Through these mechanisms Congress, in effect, extended a new benefit to produce sellers. To be entitled to trust protection the sellers were required to extend only short-term credit, *see* H.R. REP. NO. 98–543, at 6–7 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 410; Regulations Under the Perishable Agricultural Commodities Act; Addition of Provisions to Effect a Statutory Trust, 49 Fed.Reg. 45735, 45738 (Nov. 20, 1984) [hereinafter Trust Regulations], and, in the event of defaults, promptly to pursue administrative and judicial remedies. *See Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 671 (7th Cir.2002); *In re: Havana Potatoes of N.Y. Corp.*, 55 Agric. Dec. 1234 (U.S.D.A.1996). The sellers' prompt resort to administrative remedies was intended to isolate and to put pressure on financially insecure buyers to meet their obligations or to be forced from the business. The sellers who complied were, in turn, afforded a highly unusual trust beneficiary status that permitted them, in the case of defaults, to trump the buyers' other creditors, including secured ones. But nothing in the text of PACA, in its legislative history, or in its implementing regulations indicates that PACA's super-priority was intended to benefit sellers who dealt in other than short-term credit in accordance with PACA's regulations. *See Patterson Frozen Foods*, 307 F.3d at 671; H.R. REP. NO. 98–543, at 6–7 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 410; Trust Regulations, *supra*, 49 Fed.Reg. at 45738.

## II. Factual Background

Until its demise in September 1996, PMD bought and sold produce at the New York City Terminal Market at Hunts Point, New York ("Market"). To facilitate its business, PMD opened a checking account at HSBC in October 1995. All of the monies PMD deposited into its HSBC account were proceeds from the sale of produce and thus covered by PACA's trust provision, as HSBC knew. *Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A.*, No. 99 Civ. 1330(AGS), slip op. at 3, 9 (S.D.N.Y. Aug. 6, 2002).[4] During this relationship, HSBC processed hundreds of PMD checks made payable to dozens of payees, typically produce sellers, in the normal course of business.[5]

---

3. In addition, the USDA may sue in U.S. district court to "prevent and restrain dissipation of the trust." *Id.* § 499e(c)(5)(ii).

4. After opening the account at HSBC, PMD began depositing its cash and check receipts into that account and then transferring the monies to other checking accounts it had at different banks, which PMD used to pay its creditors. It did this because many of PMD's creditors also maintained accounts at HSBC, and checks drawn on PMD's HSBC account and deposited by those merchants into their own HSBC accounts thus would clear almost immediately. By using an account at a different bank, PMD could create a two- to three-day "float" between the time that PMD delivered checks and the time those checks were presented for payment. *Am. Banana, supra,* slip op. at 6–7.

5. HSBC was neither an investor in, nor a secured lender to, PMD apart from the fact that late in the relationship it secured personal guarantees from PMD's principals. Consequently, HSBC was not called on to make the

In January 1996, HSBC began to provide PMD with overdraft privileges as the bank began to receive checks presented for payment against PMD's account in amounts greater than the available funds in the account. On the mornings after such checks were presented to HSBC, the bank's computer system automatically issued a "referral report" that showed PMD's available funds, total funds on deposit (including deposited checks that had not yet cleared), and the amount and number of checks presented for payment the previous day. HSBC then would contact Mark Werner, PMD's owner, and request that he make a deposit to cover checks that had been presented the previous day. In this manner, HSBC would honor PMD checks by providing "daylight" overdraft accommodations that were covered by promised deposits within a few days. HSBC used checks deposited by PMD to reduce temporarily its overdraft balance. *Am. Banana, supra,* slip op. at 7–9.

The result of these procedures was that the Sellers were paid in the ordinary course of business and that delays in payments were reduced. HSBC's Hunts Point branch manager, Joseph Vessecchia, testified that because PMD was a high-volume, low-margin business, the fact that PMD used its overdraft privileges for very short periods of time did not indicate to him that PMD was in financial distress. In the period between June 1996 and September 1996, during which most of Sellers' claims accrued, there was a total of forty days in which PMD exercised its overdraft privileges, and the average overdraft on those days was $38,000. *Id.* at 8–9.

In July 1996, several of PMD's customers began slowing their payments to PMD, resulting in a tightening of PMD's cash position. Eventually, when PMD's payables began to race ahead of payments on its receivables, Werner realized that he could not sustain the company and ceased operations on September 14, 1996. At that time, PMD owed $787,353.21 to the Sellers for produce it had purchased on credit. *Id.* at 4–6, 10.

After ceasing PMD's operations, Werner proposed a debt-repayment plan to PMD's trust creditors, including the Sellers, asking them to forbear from enforcing their PACA trust rights so that he could continue buying and selling produce, preserve his business relationships with market dealers, and pay PMD's trust creditors over time. In late September 1996, PMD's trust creditors met with Werner to discuss his proposal. The Sellers' representatives and their attorney attended the meeting. At the meeting, Werner proposed (1) to assign to the New York Produce Trade Association ("Association"), of which the Sellers were members, all of PMD's accounts receivable as well as PMD's one-half interest in a cooperative unit in the Market, and (2) to make monthly payments of between $16,000 and $20,000 to the Association to be distributed *pro rata* to PMD's creditors. In return, Werner asked his creditors to forebear from enforcing their trust rights to enable him to remain in business, in part by working for one of his creditors, E. Armata, Inc., so he could make the monthly payments from profits he would continue to earn. After Werner presented this proposal, the creditors discussed it and twenty minutes later orally informed Werner that they had accepted the workout-and-forbearance proposal. *Id.* at 10–11.

type of ongoing inquiry into the business condition of PMD a secured lender would typically make. *Cf. Albee Tomato, Inc. v. A.B. Sha-* *lom Produce Corp.,* 155 F.3d 612, 614, 616–18 (2d Cir.1998).

Werner subsequently executed the assignments and made some payments to the Association, but the Sellers ultimately were unsatisfied with their recovery and pursued claims against HSBC in the District Court. They claimed, *inter alia,* that HSBC's receipt of funds subject to a PACA trust and retention of them in repayment of PMD's overdraft balance violated PACA.

Following a three-day bench trial, the District Court granted judgment to the Sellers. It explained that HSBC, as a third party, could be liable for receiving trust assets in breach of trust only if PMD, as the trustee, had itself breached the PACA trust by transferring those assets to the bank. *Id.* at 13. After examining PMD's actions, the Court found that PMD had not breached the trust by depositing any funds that were used to pay PACA beneficiaries. *Id.* (citing *Boulder Fruit Express & Heger Organic Farm Sales v. Transp. Factoring, Inc.,* 251 F.3d 1268, 1272 (9th Cir.2001), *cert. denied,* 534 U.S. 1133, 122 S.Ct. 1077, 151 L.Ed.2d 978 (2002)). However, the Court also found that PMD had breached the trust when it deposited funds that were used to pay non-PACA creditors. *Id.* The Court then turned to the issue of HSBC's liability and held the bank liable for receiving the latter deposits, reasoning that the overdrafts had been loans, that the deposits made by PMD constituted repayments of those loans, and that, by receiving those repayments, HSBC retained trust funds for itself which were required to be distributed to unpaid PACA beneficiaries. *Id.* at 14. The Court also rejected each of HSBC's three defenses—(1) that HSBC was a "bona fide purchaser" for value of the trust assets, (2) that the post-default agreement rendered the Sellers ineligible to recover under PACA, and (3) that laches barred the Sellers' claims. *Id.* at 14–17. Accordingly, the District Court, in a series of amended orders, entered judgment for the Sellers for $278,967, including interest. *See id.* at 17; *Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A.,* No. 99 Civ. 1330(AGS), Am. Order at 2–5 (S.D.N.Y. Oct. 4, 2002); *Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A.,* No. 99 Civ. 1330(AGS), Am. J. at 1–2 (S.D.N.Y. Oct. 18, 2002).

█ On this appeal, the Sellers seek damages from HSBC in the amount of $787,353.21, the full amount PMD owes them, on the theory that HSBC violated PACA every time it used a deposit from PMD to offset PMD's overdraft balance. HSBC cross-appeals, contesting its liability. We review the District Court's findings of fact for clear error and its conclusions of law *de novo. Oscar Gruss & Son, Inc. v. Hollander,* 337 F.3d 186, 193 (2d Cir.2003).

## DISCUSSION

### I. HSBC's Liability

The Sellers contend that the District Court erred by limiting HSBC's liability to only those deposits that were ultimately used to pay non-PACA creditors. They claim that *all* deposits used to offset PMD's overdraft balance constituted payments to a non-PACA creditor—namely, HSBC—regardless of whether PMD later withdrew the funds to pay someone else. According to the Sellers, therefore, HSBC violated PACA whenever it applied PMD deposits to offset PMD's overdraft balance. Consequently, the Sellers argue, any funds received in this fashion dissipated trust assets, regardless of whether they were subsequently paid out to PACA or non-PACA creditors, and are recoverable to the full extent of PMD's debt to the Sellers ($787,353.21), rather than just to the extent funds were ultimately paid to non-PACA creditors ($181,129). HSBC

contends that, with the exception of the fees and interest payments retained in consideration for the overdraft privileges extended to PMD, the bank was a mere "conduit" for all trust funds that were deposited in PMD's account, because those funds were released by the bank freely and at PMD's direction.

■ We previously have explained that the trust created by PACA is governed by general trust principles. *Albee Tomato,* 155 F.3d at 615; *Endico Potatoes,* 67 F.3d at 1067. Under such principles, as correctly noted by the District Court, a third party such as HSBC cannot be liable for receiving funds in breach of a PACA trust unless the trustee's transfer of funds to the third party constituted a breach of its duty as trustee to maintain trust assets. *See* RESTATEMENT (SECOND) OF TRUSTS § 283 (1959). The Restatement of Trusts defines a breach of trust as "a violation by the trustee of any duty which as trustee he owes to the beneficiary." *Id.* § 201. Federal regulations, in turn, prescribe the duties of a PACA trustee:

> Commission merchants, dealers and brokers are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities. Any act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of Section 2 of the Act, (7 U.S.C. [§ ] 499b).

7 C.F.R. § 46.46(d)(1). The same regulations define "dissipation," in turn, as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." *Id.* § 46.46(a)(2).

In light of these principles and the facts of this case, two distinct PACA trust issues are presented. The first issue is whether *the trustee* is liable for dissipating the trust by using trust funds to pay non-PACA creditors. The second issue is whether *the bank* is liable for receiving funds in breach of trust in the circumstances presented. With respect to the first issue—the trustee's liability—the District Court concluded that PMD had breached the trust by making payments out of trust funds to non-PACA creditors. With respect to the second issue—the bank's liability—the District Court appears to have assumed, without explanation, that HSBC automatically shared PMD's liability for dissipating trust funds, apparently on the basis that the funds PMD paid to non-PACA creditors were withdrawn from an account at HSBC. That is, the District Court assumed HSBC's liability in these circumstances without separately considering the role, if any, the bank played in PMD's breach of trust.

■ However, concluding that PMD's use of trust funds to pay non-PACA creditors constituted a breach of the trust by PMD does not necessarily compel the further conclusion that such a breach is attributable to HSBC. To evaluate HSBC's liability, we must examine *HSBC's* actions, and here it appears that HSBC took no action that inhibited PMD's ability to pay PACA beneficiaries and, indeed, had no practical control over the payments PMD made to non-PACA creditors. It merely honored checks that it was entitled to presume were validly drawn. *See In the Matter of Knox,* 64 N.Y.2d 434, 488 N.Y.S.2d 146, 477 N.E.2d 448, 450–51 (1985); *Bischoff v. Yorkville Bank,* 218 N.Y. 106, 112 N.E. 759, 760–61 (1916). Third parties such as banks, it must be remembered, are not guarantors of the PACA trust. *See Boulder Fruit,* 251 F.3d at 1272; *see also*

*Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 283 (9th Cir.1997); *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1381 (3d Cir.1994). It seems to us that the imposition of liability on HSBC under the facts of this case would impose an impossible burden on banks to monitor each check drawn on an overdrawn PACA trust account, which would be inconsistent with well-established banking law. *See Knox*, 488 N.Y.S.2d 146, 477 N.E.2d at 450–51; *Bischoff*, 112 N.E. at 760–61. The imposition of liability under such circumstances would also run the serious risk of complicating—if not eliminating altogether—overdraft procedures that directly benefit PACA beneficiaries.

Nor are we convinced that a trustee's payments of commercially reasonable fees and interest in exchange for routine banking services such as check cashing services and overdraft privileges extended to facilitate payments to beneficiaries necessarily constitute a breach of the PACA trust. *Cf. Boulder Fruit*, 251 F.3d at 1271–72 (concluding that a factoring agreement, under which trustee sold its receivables at eighty percent of face value, was not a *per se* breach of trust under PACA and, because the discount rate had not been shown to be commercially unreasonable, did not constitute a breach under the facts of the case).

Ultimately, however, we need not resolve these various issues. Even assuming that HSBC did retain the funds, it has a complete defense to PACA liability arising from the post-default agreement between the Sellers and PMD, which we discuss below.

## II. HSBC's Defense

Strict eligibility requirements accompany the extraordinary protection afforded by PACA's trust provision. One such requirement is that a seller seeking PACA trust protection must be selling produce on a cash or short-term credit basis. *See* 7 U.S.C. § 499e(c); 7 C.F.R. § 46.46(e)(1)-(2); *Endico Potatoes*, 67 F.3d at 1067 n. 2; *Patterson Frozen Foods*, 307 F.3d at 669 (citing *Greg Orchards & Produce, Inc. v. Roncone*, 180 F.3d 888, 890–91 (7th Cir.1999)). As noted above, PACA requires buyers to make "full payment promptly." 7 U.S.C. § 499b(4). Instead of prescribing a specific period of time in the statute that will satisfy this requirement, Congress left the definition of prompt payment to the regulatory discretion of the Secretary of the USDA. *See id.* § 499e(c)(3). The pertinent regulations promulgated by the USDA in conjunction with the trust provision provide:

> (1) The times for ... prompt payment are set out in § 46.2 ... (aa). Parties who elect to use different times for payment must reduce their agreement to writing before entering into the transaction and maintain a copy of their agreement in their records, and the times of payment must be disclosed on invoices, accountings, and other documents relating to the transaction.
>
> (2) The maximum time for payment for a shipment to which a seller, supplier, or agent can agree and still qualify for coverage under the trust is 30 days after receipt and acceptance of the commodities as defined in § 46.2(dd) and paragraph (a)(1) of this section.

7 C.F.R. § 46.46(e). Section 46.2(aa), in turn, provides:

> Full payment promptly is the term used in the act in specifying the period of time for making payment without committing a violation of the act. "Full payment promptly," for the purpose of determining violations of the act, means:
>
> . . .
>
> (5) Payment for produce purchased by a buyer, within 10 days after the day on which the produce is accepted;

. . .

(11) Parties who elect to use different times of payment than those set forth in paragraphs (aa)(1) through (10) of this section must reduce their agreement to writing before entering into the transaction and maintain a copy of the agreement in their records. If they have so agreed, then payment within the agreed upon time shall constitute "full payment promptly": Provided, That the party claiming the existence of such an agreement for time of payment shall have the burden of proving it.

*Id.* § 46.2(aa). In summary, these regulations require a buyer to pay the seller within ten days after the buyer has accepted the produce, but permit the parties to agree in writing before the transaction to other payment periods that do not exceed thirty days. Sellers who offer payment periods of longer than thirty days are not entitled to PACA trust protection.

■ HSBC claims that the Sellers disqualified themselves from PACA trust protection by entering into the post-default agreement with PMD that extended the payment period well beyond the thirty-day maximum allowed under the PACA regulations. *Id.* § 46.46(e)(2). The Sellers, on the other hand, contend that in order to waive PACA trust protection, a seller must enter into a written agreement, which they did not do here. The District Court agreed with the Sellers and rejected HSBC's defense. *Am. Banana, supra,* slip op. at 11, 16.

■ In reviewing the District Court's rejection of this defense, we must first consider whether the thirty-day maximum under section 46.46(e)(2) applies to post-default agreements. Although HSBC's argument and the District Court's decision assume that it does, and other circuits apparently have so held, *see, e.g., Greg Orchards & Produce,* 180 F.3d at 891–92;

*In re Lombardo Fruit & Produce Co.,* 12 F.3d 806, 809–10 (8th Cir.1993), we find that such a conclusion is not clear from the text of PACA or its regulations, both of which discuss only *pre-transaction* agreements. *E.g.,* 7 U.S.C. § 499e(c)(3) ("The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days . . . (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing *before entering into the transaction . . . .*" (emphasis added)); 7 C.F.R. § 46.46(e)(1) ("Parties who elect to use different times for payment must reduce their agreement to writing *before entering into the transaction . . . .*" (emphasis added)). We therefore turn to the legislative history of PACA to discern whether Congress intended to extend trust protection to sellers that enter into agreements after a buyer defaults that contain a payment period exceeding thirty days after the buyer has accepted the produce. *See United States v. Gayle,* 342 F.3d 89, 93–94 (2d Cir.2003) ("Resort to authoritative legislative history may be justified where there is an open question as to the meaning of a word or phrase in a statute, or where a statute is silent on an issue of fundamental importance to its correct application.").

The House Report accompanying the 1984 amendment to PACA makes clear that Congress intended trust protection to extend solely to cash and short-term credit transactions:

The committee finds that it is common practice in the produce business to extend credit for reasonable periods of time beyond the time prescribed for 'cash' transactions in regulations issued by the Secretary under the provisions of

the Packers and Stockyards Act. Consequently, to be effective, the trust applies to credit transactions as well as to the straight cash transactions. *However, the committee does not intend the trust to apply to any credit transaction that extends beyond a reasonable period.* Under the bill, the Secretary is required to establish, through rulemaking, the time by which, the parties to a transaction must agree payment on a transaction must be made, to qualify it for coverage under the trust. *An agreement for payment after such time will not be eligible to receive the benefits of the trust.*

H.R. REP. NO. 98–543, at 6–7 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 410 (emphases added). The thirty-day provision thus resulted from Congress's explicit desire to limit its extension of trust protection to reasonably short-term credit arrangements:

> Congress directed the Secretary to establish the maximum time by which the parties to a transaction can agree payment must be made and still qualify for coverage under the trust. An agreement for payment after such time will not qualify for trust coverage.

> Current payment practices, as reflected by administrative experience and industry sources, indicate that contracts calling for payment within 30 days from receipt and acceptance of the goods should qualify for trust coverage, and that contracts that call for later payment should not qualify for trust coverage.

Trust Regulations, *supra*, 49 Fed.Reg. at 45738. The primary objective of securing prompt payment was to protect sellers in this volatile industry. *See* H.R. REP. NO. 98–543, at 2–4 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406–07 ("Producers and shippers of perishable commodities are, for the most part, small size businesses. The process of growing[,] harvesting, packing and shipping perishables is a real gamble; costs are high, capital is tied up in farm land and machinery, and returns are delayed until the crop is sold. If the grower-shipper cannot realize any returns on the sale of the crop when due, he may not be able to survive."). Congress made its intention to protect short-term payment arrangements clear by expressly refusing to bestow trust protection upon "any credit transaction that extends beyond a reasonable period," H.R. REP. NO. 98–543, at 6–7 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 410. The USDA's regulations tying the definition of a "reasonable period" to its definition of "full payment promptly" corroborate our interpretation. 7 C.F.R. §§ 46.46(e)(1)-(2), 46.2(aa)(5), (11).

The question becomes, therefore, whether there is a meaningful difference between pre-transaction and post-default agreements in light of this legislative history. We conclude that there is not. We recognize that a post-default agreement is often the product of a reasonable effort by a seller to recover at least some of the debt owed to it without incurring the risks and costs of litigating under PACA, and that such an agreement therefore can be a useful tool for the recovery of unpaid debts. However, the result of a post-default agreement extending the payment period beyond thirty days is no different than that of a pre-transaction agreement doing the same: both are inconsistent with the prompt-payment objective, which is fundamental to PACA. Whether the agreement is reached before the transaction or after a buyer has defaulted, it constitutes a credit arrangement permitting a buyer to make payments that are not considered prompt by Congress and the USDA.

Furthermore, such credit arrangements, though intended to enable buyers who are unable to make prompt payments to stay

in business, can have negative, industry-wide implications:

> Just as in the case of the savings and loan industry, if a PACA licensee is in financial difficulty (i.e., not able to pay the agreed purchase prices of perishable agricultural commodities promptly), the loss to the perishable agricultural commodities industry as a whole is frequently much less if the PACA licensee's license is revoked promptly. Allowing a PACA licensee that is in financial difficulty to remain in business increases financial risks to others. Frequently, a PACA licensee in financial difficulty increases its volume significantly, perhaps taking imprudent risks. If the PACA licensee's efforts to regain financial stability are unsuccessful, many other unsuspecting persons are exposed to the risk of nonpayment.

*Havana Potatoes*, 55 Agric. Dec. 1234. This is particularly true after a buyer has demonstrated its financial instability by defaulting on its payment obligations. Therefore, Congress could not have intended to exempt from disqualification sellers who enter into post-default agreements extending a payment period beyond thirty days, while specifically disqualifying sellers who enter into pre-transaction agreements having the same effect. Sellers who are willing and able to enter into such agreements—whether pre-transaction or post-default—neither need nor deserve the elevated priority they receive under PACA's trust provision. As the Seventh Circuit recently observed:

> Another major objective of PACA is to avoid large financial collapses in the produce industry. The strict 30-day time limits are purposely designed to bring a subper-forming [sic] dealer to the attention of the USDA quickly, so that it can act to resolve the problem or suspend the dealer's license. If one industry member is in financial distress, not much is at stake. But if many large wholesalers work out long-term payment plans and extensions, allowing a dealer to amass huge liabilities, that dealer's eventual bankruptcy or license revocation could cause much more severe repercussions throughout the industry. One would not want to reward the wholesalers who helped create such a mess by then giving them a strong right to recover their debts through superpriority in bankruptcy or through trust suits piercing the corporate veil.

*Patterson Frozen Foods*, 307 F.3d at 671; *see also Greg Orchards & Produce, Inc. v. Roncone*, 180 F.3d 888, 892 (7th Cir.1999) ("By disqualifying suppliers who enter into post-default agreements that violate PACA, we can ensure that the extraordinary protection provided by PACA is not enlarged beyond its intended scope."); *Tri–County Wholesale Produce Co. v. U.S.D.A.*, 822 F.2d 162, 163 (D.C.Cir.1987) (noting that a primary " 'goal of [PACA is] that only financially responsible persons should be engaged in the businesses subject to the Act' " (quoting *Finer Foods Sales Co., Inc. v. Block*, 708 F.2d 774, 782 (D.C.Cir.1983)) (alteration in original)).

Accordingly, we conclude that Congress's intention in not applying the trust to "any credit transaction that extends beyond a reasonable period," H.R. REP. NO. 98–543, at 6–7 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 410, is best effectuated by understanding section 46.46(e)(2) of the PACA regulations to be applicable to post-default as well as pre-transaction agreements.

█ Having concluded that section 46.46(e)(2) applies to post-default agreements, we must next determine whether the District Court correctly rejected HSBC's argument that the Sellers lost trust protection by entering into a post-

default agreement with PMD that extended the payment period beyond thirty days. When it rejected this defense, the District Court reasoned that although there was a written proposal by Werner to pay PMD's debt that "PMD's trust creditors [orally] had accepted," and although Werner had performed some of his obligations under the agreement, "plaintiffs never signed any written agreement under which they agreed to forebear from asserting their rights under PACA." *Am. Banana, supra,* slip op. at 11, 16. The District Court concluded, in other words, that although the Sellers and PMD had, in fact, entered into a post-default agreement, that agreement did not disqualify the Sellers from PACA trust protection because it was not in writing.

In reaching its conclusion, the District Court followed the approach taken by the Seventh and Eighth Circuits, which have held that a written—but not an oral—post-default agreement between a seller and a dealer that extends the dealer's time for payment beyond thirty days results in the loss of the seller's trust protection. *See Patterson Frozen Foods,* 307 F.3d at 669–70; *In re Lombardo Fruit & Produce,* 12 F.3d at 809–10 & n. 3; *Hull Co. v. Hauser's Foods, Inc.,* 924 F.2d 777, 781–82 (8th Cir.1991). As the Seventh Circuit recently explained:

> If a produce supplier enters a written post-default agreement with a dealer that extends the dealer's time for payment beyond 30 days, the supplier becomes ineligible to assert its trust

rights. On the other hand, an oral agreement for an extension or a course of dealing allowing more than 30 days for payment will not abrogate a PACA trust.

*Patterson Frozen Foods,* 307 F.3d at 669 (citations omitted).[6] Under this approach, all oral agreements concerning payment periods are disregarded for purposes of PACA liability, resulting in imposition of the ten-day default and preservation of trust protection for the seller.

We find nothing in the text of PACA or in its regulations which requires that a provable post-default agreement extending a payment period beyond thirty days must, without exception, be reduced to writing before it will disqualify a seller from PACA's trust protection. The regulations merely provide that "[p]arties who elect to use different times of payment . . . must reduce their agreement to writing before entering into the transaction." 7 C.F.R. § 46.2(aa). In view of Congress's clearly expressed intention to extend trust protection solely to cash and short-term credit transactions, *see* 7 U.S.C. § 499e(c); 7 C.F.R. §§ 46.46(e), 46.2(aa), we cannot interpret this regulation to mean that parties are free to enter into agreements that violate PACA's prompt payment rules as long as they do not reduce their agreements to writing.

Rather, we conclude that a failure to reduce to writing an agreement that violates PACA, should not result in the pres-

**6.** Although the Seventh Circuit cited *Idahoan Fresh v. Advantage Produce, Inc.,* 157 F.3d 197, 205 (3d Cir.1998), for the proposition that "an oral agreement for an extension . . . allowing more than 30 days for payment will not abrogate a PACA trust," *Patterson Frozen Foods,* 307 F.3d at 669, we note that, to the contrary, *Idahoan Fresh* expressly did "not reach[ ] the issue of what would happen if the oral extension provided for a payment period

in excess of 30 days" because that situation was not presented. 157 F.3d at 205 n. 8. Rather, in addressing oral agreements extending payment periods of 15 and 20 days, the *Idahoan Fresh* court found that the writing requirement articulated in PACA and its regulations "relates to the enforceability of an agreement to extend a payment term, but does not disqualify an unpaid seller from receiving trust benefits." *Id.* at 204.

ervation of the trust, where the same agreement, if memorialized, would have resulted in forfeiture of such protection. To hold otherwise would yield the unacceptable result of preserving trust protection for a seller who reaches an agreement containing a payment period exceeding thirty days and performs thereunder so long as the seller does not reduce the agreement to writing. Accordingly, we hold that where, as here, a seller agrees— orally or in writing—to a payment period exceeding thirty days, it forfeits trust protection.

■ Even if we were to assume *arguendo* that a writing is required, we hold that there are writings in this case that satisfy the generally applicable Statute of Frauds, and that such writings are sufficient to disqualify the Sellers from trust protection. *See Patterson Frozen Foods*, 307 F.3d at 671 ("PACA rights are lost whenever the parties enter into a written agreement that satisfies the generally applicable Statute of Frauds."). As discussed, PACA does not set out specific requirements for post-default agreements, and under the Restatement of Contracts,

[u]nless additional requirements are prescribed by the particular statute, a contract within the Statute of Frauds is enforceable if it is evidenced by any writing, signed by or on behalf of the party to be charged, which

(a) reasonably identifies the subject matter of the contract,

(b) is sufficient to indicate that a contract with respect thereto has been made between the parties or offered by the signer to the other party, and

(c) states with reasonable certainty the essential terms of the unperformed promises in the contract.

RESTATEMENT (SECOND) OF CONTRACTS § 131 (1981); *see also Patterson Frozen Foods*, 307 F.3d at 671–72 (concluding that

"PACA rights are lost whenever the parties enter into a written agreement that satisfies the generally applicable Statute of Frauds"); *Consolidation Servs., Inc. v. KeyBank Nat'l Ass'n*, 185 F.3d 817, 819 (7th Cir.1999) ("An ordinary statute of frauds merely requires that the party sought to be charged ... sign a memorandum of the parties' agreement. The memorandum needn't be the contract itself; it need only be evidence of the contract and the contract's essential terms, and the other party to the alleged contract need not have signed anything." (citations omitted)). In *Patterson Frozen Foods*, the court found that a fax and a letter, signed by the seller's agent, reasonably identified the contract's subject matter and demonstrated agreement on payment periods because they contained a payment schedule in which the dealer would pay $8,356.46 per month for eight months, which the seller found to be "agreeable." 307 F.3d at 668, 670–71. Those documents also "state[d] with reasonable certainty the unperformed promises in the contract, that [the trustee would] pay on the dates indicated, and that [the seller would] forebear from going forward with its PACA reparation action so long as payments [we]re forthcoming." *Id.* at 671.

In this case, HSBC points to several writings it believes collectively satisfy the Statute of Frauds. The first, to which HSBC points only for context, is an undated letter drafted sometime prior to October 27, 1996 from Werner to the Sellers' counsel, written to "bring [the Sellers' counsel] up to date on what [Werner was] doing to comply with the directions of the Association on collecting [PMD's] receivables and other matters." Letter from M. Werner to L. Kreinces. In that letter, Werner discusses his efforts to collect PMD's accounts receivable, advises the Sellers' counsel that he will be starting

work with E. Armata on October 27, 1996, and acknowledges the Sellers' counsel's desire for him to "sign some papers." *Id.* The second writing contains the "papers" likely referred to in Werner's pre-October 27, 1996 letter, an "Assignment of Accounts Receivable" drafted by the Sellers' counsel and signed by Werner and the Sellers' counsel on November 12, 1996. Assignment of Accounts Receivable of Nov. 12, 1996. In this document, PMD assigned to the Association, which was represented by the Sellers' counsel, all of its accounts receivable for produce it sold. *See id.* The third writing is a December 23, 1996 notice authored by the Sellers' counsel and sent to PMD's PACA creditors, in which the Sellers' counsel states that he has received "the first monthly installment from the debtor as a result of his operations with E. Armata, Inc.," in the amount of $7,500.00, and that similar payments "should continue on a monthly basis." Notice from L. Kreinces to Creditors of PMD of Dec. 23, 1996. The fourth writing, authored by the Sellers' counsel, is a March 27, 1997 letter to Werner's counsel "admonish[ing] [him and Werner] to meet with [one of PMD's account debtors] forthwith," stating that if they failed to do so, he would "serve Notices of Discovery and Inspection and Deposition notices without delay," and "suggest[ing] that [they] file a Notice of Appearance or an Answer with the U.S. District Court in order to complete jurisdiction." Letter from L. Kreinces to P. Haberman of Mar. 27, 1997. In the same document, the Sellers' counsel discusses the purchase price of the one-half interest in the cooperative unit in the Market that Werner had proposed assigning to the Association, and in a subsequent letter to the Association dated May 11, 1998, the Sellers' counsel accounts for the sale of that unit for $50,000. *Id.;* Letter from L. Kreinces to L. Sherman of May 11, 1998. The fifth writing

highlighted by HSBC is the Sellers' counsel's August 14, 1997 notice to PMD creditors stating that he had "been informed that [Werner] is no longer associated with E. Armata Inc. effective Sunday evening." Notice from L. Kreinces to Creditors of PMD of Aug. 14, 1997. The final writing highlighted by HSBC is the Sellers' counsel's letter to Werner's counsel, written two months later, on October 17, 1997, in which he states:

I also want to know from you whether your client intends to make monthly payments on account of their debt to the Market. I shall like to know this well before the conference date. I must tell you this matter is at an end as far as I am concerned. I am proceeding to procure judgment and seek to collect all sums due on behalf of the merchants in the Market.

There are other remedies which I am also considering which will proceed as time goes on. Unless you give this matter your immediate attention, I shall proceed as herein set forth.

Letter from L. Kreinces to E. Zinbarg of Oct. 17, 1997.

We conclude that these writings are sufficient to satisfy the Statute of Frauds. Like the letter and fax in *Patterson Frozen Foods,* all of the writings signed by the Sellers' counsel reasonably identify the post-default agreement's subject matter and demonstrate agreement between Werner and the Sellers' representative on monthly payments, and the assignment of receivables and Werner's interest in the cooperative unit. They also state with reasonable certainty the unperformed promise in the contract—that Werner would continue to make monthly installments, similar to his first payment of $7,500, so long as he owed money to the Sellers. And they plainly demonstrate that the Sellers agreed to—and, in fact, for a period far in excess of thirty days did—forebear from

proceeding with their lawsuit as long as Werner made monthly payments. Because these writings are sufficient to satisfy the Statute of Frauds, we conclude that the Sellers are disqualified from asserting their trust rights against HSBC.[7]

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the District Court and remand with instructions to enter judgment for HSBC.

7. We therefore need not reach HSBC's other defenses.